UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

JB and AB, individually and as parents )
and next friends of GB, a minor, )
 )
      Plaintiffs )
 )
v. ) No. 2:13-cv-11-DBH
 )
WELLS-OGUNQUIT COMMUNITY )
SCHOOL DISTRICT, )
 )
      Defendant )

## RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

The plaintiffs, JB and AB, bring this appeal from the decision of a hearing officer of the Maine Department of Education on their challenge to the decision of the defendant to discontinue special education services to their child, GB. After careful review of the administrative record and the parties' brief, I recommend that the court adopt the following findings of fact and conclusions of law, on the basis of which I recommend that the appeal be denied.

### I. Proposed Findings of Fact

1. GB was born on November 16, 2001. Special Education Due Process Hearing ("Hearing Decision"), *[B] v. Wells Ogunquit Community School District*, No. 12.105H (Me. Dep't of Educ. Oct. 26, 2012) at 2, Record at 635.

2. From kindergarten through fourth grade, GB attended Wells Elementary School. For the fifth grade, she attended Wells Junior High School. *Id*.

3. The parents referred GB for special education in June 2009, *Id*. at 3 (636).

4. GB received tutoring in the Lindamood Phoneme Processing System ("LiPS") program at the Center for Communication beginning in August 2009; the school district was aware that she was receiving this private tutoring. *Id*.

5. GB was identified as eligible for special education and related services in October 2009 in the category of specific learning disability. *Id*. Her Individualized Education Program ("IEP") called for specially designed instruction in reading to be provided by a special education teacher in the resource classroom one hour per day. *Id*.

6. The IEP created for GB on October 28, 2010, added an additional 45 minutes per day of specially designed instruction in writing and spelling with the special education teacher in the resource classroom to GB's one hour of specially designed instruction in reading each day. *Id*. at 3-4 (636-37).

7. In December 2010, GB's progress on her IEP goals was rated as satisfactory. Her fall 2010 NECAP test result in reading was a scaled score of 345, placing her in the proficient category. *Id*. at 4 (637).

8. In the fall of 2010, GB received a score of 200 in reading on the NWEA, placing her in the 75th percentile. *Id*. Her score in the spring of 2011 was 206, placing her in the 68th percentile. *Id*. at 5-6 (638-39).

9. At its February 2011 meeting, GB's IEP team decided to reduce her time in the special education setting to 15 minutes per day of targeted, specially designed instruction. *Id*. at 5 (638).

10. The parents brought GB to Hyperion Learning Services in April 2011, where she could receive the same services as those provided by the Center for Communication at a lower cost. *Id*. at 6 (639). Victoria Papageorge, M.Ed., M.S., a certified special education consultant, began Hyperion Learning Services in 2002. *Id*.

11. At Hyperion Learning Services, GB has worked one-on-one with Robin Vaughn, who is trained in the LiPS and Seeing Stars programs. *Id*. Ms. Papageorge has consistently recommended two hours of instruction weekly for GB, but she has attended only one hour per week during school years. *Id*.

12. Beth Hutchins, GB's special education teacher for the second and third grades, felt that GB was skilled enough to be entirely in the generalized education setting. She believed that GB would have performed adequately going into the fourth grade without any special education services. *Id*. at 7 (640).

13. GB's NWEA reading score in the fall of her fourth grade year was 211, placing her in the 78th percentile. *Id*. at 8 (641). Her NECAP scaled score at approximately the same time was 452, placing her in the proficient category. *Id*.

14. On October 26, 2011, GB's IEP team met to conduct her annual review. *Id*. Ms. Papageorge did not attend the meeting, and there is no indication that her report of her October 21, 2011, educational evaluation of GB was discussed. *Id*. In that evaluation, GB's overall orthographic ability score was in the below average range, and her sight spelling score had dropped from the 50th percentile to the 2nd. *Id*.

15. The IEP team determined that GB had a specific learning disability in the area of reading, and that she was able to access the general curriculum but needed daily practice to make progress to become an accurate, fluent oral reader. *Id*. at 9 (642). The IEP called for GB to obtain five 10-minute sessions per week of specially designed instruction in English/language arts and for the special education teacher to provide consultation in the regular education setting for 10 minutes once a month. *Id*. Linda Logan, the fourth grade special education teacher, was familiar with the LiPS program and utilized similar decoding strategies with GB. *Id*.

16. The written notice following the IEP team meeting indicated that the Team decided to reduce the amount of services to GB because she was making progress in all subjects at the general education level and performing at grade level. *Id*. At the meeting, the father agreed with the change. *Id*. at 10 (643). The parents decided not to ask for an updated evaluation because of fear that GB's eligibility would be discontinued if her test results were too good. *Id.*

17. The reduced level of services was adopted with the understanding that GB's progress would be carefully monitored and a parent meeting would be held in December 2011. *Id*.

18. Ms. Papageorge conducted another educational evaluation of GB on November 1, 2011. *Id*. It is likely that she first presented the results of this evaluation to the IEP team at its January 2012 meeting. *Id*.

19. On November 3, 2011, the parents met with Ken Spinney, the vice principal, and Karen Ropes, the director of special education, to discuss the parents' concern that GB's written product had been misrepresented at the IEP team meeting. *Id*. This was the first time that Ms. Ropes had been directly involved with the family. *Id.* Ms. Papageorge attended the meeting, but left after a few minutes because Ms. Ropes felt that the parents' concern was a personnel issue. *Id*. at 11 (644). The participants agreed to complete a reevaluation of GB. *Id*.

20. On December 14, 2011, Scott Hoch, Ph.D., completed a psychological evaluation of GB and concluded that all of her skills were within the average range, although she had a relative area of weakness in her fluency skills and she perceived that she read more slowly than other students. *Id*. He did not believe that GB required special education. *Id*. at 12 (645).

21. On January 4, 2012, Ms. Ropes observed GB during a technology lesson in her computer lab. *Id*. She observed that GB had difficulty spelling the password but that she exhibited ease and confidence when navigating the web-based material once she was able to access it. *Id*.

22. Also on January 4, 2012, Summer Massaro Roy, M.A., CCC-SLP, conducted a speech-language evaluation of GB. *Id*. She made specific suggestions for the IEP team to consider, but observed that her speech and language skills were comparable to those of her same-age peers. *Id*. at 12-13 (645-46).

23. On January 5, 2012, Elizabeth Goodwin, M.S.Ed., conducted an academic evaluation of GB, resulting in all scores in the average range. *Id*. at 13 (646). She also suggested specific steps to address GB's relative weaknesses in word recognition, decoding, and spelling. *Id.*

24. On January 9, 2012, Kayla Hinkley, MS, OTR/L, completed an occupational therapy evaluation of GB. *Id*. As a result, Ms. Hinkley recommended providing specific visual activities. *Id*. at 13-14 (646-47).

25. On January 23, 2012, GB's IEP team completed its review of her reevaluation and determined, over the objections of the parents and Ms. Papageorge, that GB did not present with a specific learning disability, because she did not present with adverse impacts to her academic performance on achievement testing, NWEA testing, and NECAP testing. *Id*. at 14 (647). Again over objection from the parents and Ms. Papageorge, the team determined that GB did not require special education services and should be dismissed from services with an exit plan to general education. *Id*.

26. The team recommended that the exit plan include continuation of services through February 17, 2012, commencement of a full general education program on February 23, 2012, implementation of an exit plan through December 12, 2012, monthly consultation between a special education teacher or highly qualified English and language arts teacher and GB's general education teacher, support services twice a week for 30 minutes, classroom accommodations, and a review of the plan by December 2012. *Id*. at 15 (648).

27. On February 17, 2012, Ms. Ropes reported to the parents that she had met with GB's special education consulting teacher, her classroom teacher, and her special education teacher to determine the specific components of the exit plan, which would be fully implemented after the February vacation. *Id*.

28. In the spring of 2012, GB received a score of 219 in reading on the NWEA test, placing her in the 81st percentile and showing student growth of 13 compared to typical growth of 8. *Id*.

29. Michelle Lazzara, GB's fourth grade general education teacher, reported that she progressed in her ability and confidence in reading out loud throughout the year and that she was reading between a fourth and fifth grade level. *Id*. at 16 (649). Ms. Ropes believes that GB will achieve sufficiently without special education. *Id*. The family was concerned that GB would fail without specially designed instruction and would be unable to keep up with the increased work demands of fifth grade. *Id*.

## II. Proposed Conclusions of Law

1. A party dissatisfied with the decision of a Maine Department of Education hearing officer may appeal that decision to the Maine Superior Court or to the United States District Court. 20-A M.R.S.A. § 7207-B(2)(B); *see also* 20 U.S.C. § 1415(i)(2)(A).

2. The IDEA provides that a court reviewing the decision of a hearing officer "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

3. "The role of the district court is to render bounded, independent decisions—bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court." *Hampton Sch. Dist. v. Dobrowolski*, 976 F.2d

48, 52 (1st Cir. 1992) (citation and internal quotation marks omitted). "While the court must recognize the expertise of an administrative agency, as well as that of school officials, and consider carefully administrative findings, the precise degree of deference due such findings is ultimately left to the discretion of the trial court." *Id.* (citations and internal quotation marks omitted).

    4. The First Circuit and other courts have suggested that with respect to a hearing officer's legal conclusions, the level of deference due depends on whether the court is equally well-suited to make the determination despite its lack of educational expertise. *See, e.g., Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2003) ("Less weight is due to an agency's determinations on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation. More weight, however, is due to an agency's determinations on matters for which educational expertise is relevant.") (citations and internal quotation marks omitted); *Abrahamson v. Hershman*, 701 F.2d 223, 231 (1st Cir. 1983) (noting that while it might be "inappropriate for a district court under the rubric of statutory construction to impose a particular educational methodology upon a state[,]" court was free to construe term "educational" in IDEA "so as to insure, at least, that the state IEP [individualized education plan] provides the hope of educational benefit."). Even as to findings of fact, the court retains the discretion, after careful consideration, "to accept or reject the findings in part or in whole." *Town of Burlington v. Department of Educ.*, 736 F.2d 773, 792 (1st Cir. 1984), *aff'd* 471 U.S. 359 (1985).

    5. In IDEA cases, as in other contexts, the burden of persuasion rests on the party seeking relief. *See, e.g., Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 51 (2005); *Dobrolowski*, 976 F.2d at 54; *Maine Sch. Admin. Dist. No. 35 v. Mr. & Mrs. R.*, 176 F.Supp.2d 15, 23 (D. Me. 2001), (rec. dec., *aff'd* Feb. 27, 2002), *rev'd on other grounds*, 321 F.3d 9 (1st Cir. 2003) ("The party allegedly

7

aggrieved must carry the burden of proving . . . that the officer's award was contrary to law or without factual support.").

## A. Specific Learning Disability

6. The plaintiffs contend that the hearing officer should have found that GB was a student with a specific learning disability in the areas of reading fluency, basic reading, and written expression. Plaintiffs' Memorandum of Law ("Plaintiffs' Memorandum") (ECF No. 22) at 15-30.

7. Under the IDEA and its related regulations, a specific learning disability is

> a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell or do mathematical calculations[.]

34 C.F.R. § 300.8(c)(10). The Maine state regulation is identical. Maine Unified Special Education Regulation, Code Me. R. 05-071 ch. 101 (2012) ("MUSER"), § VII.2(L)(1). A student may be identified as one with a specific learning disability when she "does not achieve adequately for the child's age or to meet State-approved standards . . . when provided with learning experiences and instruction appropriate for the child's age or State-approved grade-level standards," 34 C.F.R. § 300.309(a)(1); "does not make sufficient progress to meet age or State-approved grade-level standards . . . when using a process based on the child's response to scientific, research-based intervention," *id.* § 300.309(a)(2)(i); or "exhibits a pattern of strengths and weaknesses in performance, achievement, or both, relative to age, State-approved grade-level standards, or intellectual development, that is determined by the [school team] to be relevant to the identification of a specific learning disability, using appropriate assessments[.]" *Id.* § 300.309(a)(2)(ii). *See also* MUSER § VII.2(L).

8. The plaintiffs' first argument is that the hearing officer failed to "appreciat[e] the difference between answering the S[pecifc] L[earning] D[isability] eligibility question for a

8

student receiving only general education services and seeking IDEA eligibility *as opposed to* answering it in the context of a potential termination of eligibility for a student already receiving special education services[.]" Plaintiffs' Memorandum at 17 (emphasis in original). They go on to assert that "[t]he fact that a student can achieve adequately *with* the support of special education and related services is not . . . the yardstick by with to determine whether to terminate her IDEA eligibility." *Id*. at 17-18 (emphasis in original).

9. The defendant does not respond directly to this argument, but, carried to its logical extreme, the argument would mean that any student receiving services in the category of specific learning disability could never lose her eligibility for special education services, because her progress or status could only be measured while she was still receiving such services. The plaintiffs cite no authority for this position, but I need not consider it further, because the hearing officer did consider, as the plaintiffs say was necessary, "whether [GB] would achieve adequately in all relevant areas if she received only general education services, and no special education services." *Id*. at 18.

10. The hearing officer wrote, in pertinent part, in response to the same argument made by the parents at that time:

> [A] change in a student's eligibility by an IEP Team must be based on measured achievement on IEP goals and data indicating adequate progress and a conclusion that the student's needs could be addressed through the general education curriculum. MUSER § VII.4.A. In addition, a Team must create a plan for assessing that the student continues to make progress once an IEP is terminated, including a plan for what will be done if progress ceases after eligibility [is terminated]. MUSER § VII.4.A.

Hearing Opinion at 25 (Record 658).

11. She continued:

> First, the school district appropriately considered whether the student's needs could be met in the general education setting.

9

> * * *
>
> All three of these pieces of guidance [two court opinions and a letter from the Office of Special Education Programs] suggest that school districts need to consider not just IEP services but also outside support when reviewing an identified student's eligibility for continued services. Here, the school district was aware of the weekly tutoring throughout the student's period of identification and at the time of her subsequent termination from services. Although the school district was not as diligent as it should have been in ensuring that Ms. Papageorge's educational evaluations were included in the student's IEP Team record, Ms. Papageorge did attend the meeting at which the student was deidentified, as well as a prior meeting, and was given the opportunity to share her reports and recommendations. In contrast with the student here, who was receiving one hour of outside tutoring each week, the student in N and S was receiving significant outside services as well as daily accommodations and substantial homework assistance. Furthermore, the school district here fully evaluated the student's progress in the general education curriculum and her ability to have her needs met there. The school district further buttressed its analysis by providing the student a nearly year-long exit plan, consistent with MUSER § VII.4.A(3), and there was no indication by the end of grade four that the student was faltering.
>
> In addition, the school district did not err in finding that the student was achieving adequately for her age or meeting State-approved grade level standards in the areas of oral expression, written expression, and basic reading skill.

*Id.* at 30-32 (663-65)(record citation omitted).

12. The plaintiffs complain specifically that the defendant used the Maine Department of Education's "Learning Disability Evaluation Report" form "to decide whether to terminate GB's IDEA eligibility," and that it found Question 3 on that form "decisive." Plaintiffs' Memorandum at 19. Question 3 asks: "Is the student achieving adequately for the student's age or meeting State-approved grade level standards in all of the areas below, when provided with learning experiences and instruction appropriate for the student's age or State approved grade level standards?" Record at 66.

13. It is misleading to characterize the IEP Team's use of the form as making Question 3 "decisive." The form directs the user to stop filling out the form is Question 3 is answered "yes." *Id*. It is the form that makes the response "decisive," not the person who fills it out. The form directs the person filling it out to "verify" the response to Question 3, and the following is handwritten in the space provided: :WIAT IV -/ NWEA – Rdg 78%ile, 97%ile/NECAP gr 3 Proficient R/M." *Id*.

14. The plaintiffs take issue with the question, asserting that "it does not apply directly to a student already identified under the IDEA and receiving special education and related services." Plaintiffs' Memorandum at 19. However, they make no attempt to establish that the defendant used this form by choice, rather than because the state Department of Education directed them to do so under the circumstances. If the defendant was obligated to use the form, the propriety of the question has no bearing on the propriety of the defendant's decision in this case. In any event, the record makes clear that the form was not the only information upon which the IEP team or the hearing officer relied.

15. The plaintiffs assert that "both the District and the Hearing Officer should have asked whether the evidence supports the conclusion that GB would achieve adequately in the areas affected by her disability . . . if all of her special education services (public and private) were terminated." *Id*. at 19-20. If the plaintiffs mean to suggest that their choice to provide GB with one hour per week of private "special education services" requires her public school to continue to provide her with public special education, regardless of any other factors, they are incorrect. The plaintiffs' argument seems to be that the defendant and the hearing officer were required to accept the testimony of Ms. Papageorge, on this and every other issue, rather than the very different

11

testimony of GB's teachers, *id*. at 20, and that is similarly not a correct statement of applicable law. *See, e.g., County Sch. Bd. of Henrico Cty. v. R.T.*, 433 F.Supp.2d 657, 679 (E.D. Va. 2006).

16. The plaintiffs contend that the defendant and the hearing officer performed "no analysis . . . to determine whether termination of those specialized services . . . would adversely affect her continued ability to achieve adequately in the relevant academic skill areas." Plaintiffs' Memorandum at 20. To the contrary, the defendant and the hearing officer were aware of the need to assess the facts in this manner, and they did so. *See, e.g.,* Hearing Opinion at 31-33 (Record at 664-66); *id*. at 7 (640) ("Ms. Hutchins [the student's special education teacher for third grade] felt the student was skilled enough to be entirely in the generalized education setting. . . . [She] believed that the student would have performed adequately going into fourth grade even without any special education services."); 9 (642) ("Ms. Hutchins supported the continuation of special education services into the fifth grade primarily to ensure that the student made a successful transition to a new general education teacher and she wanted the student to be confident that the special education staff was still available to her if needed."); 12 (645) ("Dr. Hoch did not believe that the student required special education and testified that his recommendations would have looked very different if he had."); 14 (647) ("the [IEP] Team concluded that the student achieved adequately for her age or by meeting state-approved grade level standards in all areas listed (oral expression, listening comprehension, written expression, basic reading skill, reading fluency skills, reading comprehension, mathematics calculation, and mathematics problem solving) when provided with learning experiences and instruction appropriate to her age or state-approved grade level standards.").[1] The plaintiffs follow their contention with a recitation of Ms. Papageorge's opinions, but again, there is no legal requirement that the defendant or the hearing officer accept

---

[1] "Learning experiences and instruction appropriate to her age or state-approved grade level standards" does not, from all that appears, include any special education services.

that testimony over the opinions of others concerned with, and familiar with, GB's educational progress.

17. The plaintiffs attack the defendant and the hearing officer for citing scores attained by GB while she was receiving special education services, Plaintiffs' Memorandum at 18-20. Plaintiffs' Reply Memorandum of Law ("Reply") (ECF No. 31) at 1-4, but there was no way to test GB's performance in the absence of those services. The plaintiffs offer no other means of objective testing that would be free of what they characterize as this taint. They certainly offer no authority for the proposition that a decision to terminate eligibility for special education services can only be made independent of any objective testing results. Moreover, the fact that the scores at issue were attained while GB was receiving limited special education services was a fact that the defendant and the hearing officer could take into consideration.[2]

18. Almost all of the case law cited by the plaintiffs is cited for general propositions not at issue in this case: that a student may have a specific learning disability entitling him or her to special education services despite receiving passing grades or meeting grade-level benchmarks, Plaintiffs' Memorandum at 27; that special education services may be required when any single area of a child's academic performance is poor, *id*. at 28; and that students with great intellectual potential may nonetheless qualify for special education services, *id*. at 28-29.

19. The sole exception is an unpublished Complaint Investigation Report, apparently filed by an investigator for the Maine Department of Education, the text of which was provided by the plaintiffs. *Id*. at 21. There was no hearing in that case, and no evidence was presented to a hearing officer or a court. The parents complained that the school district had wrongly failed to identify

---

[2] Dr. Hoch testified that GB would "still benefit in school" without the one hour per week of private tutoring in the Lindamood Bell system provided by Hyperion. Transcript, Volume 2, *In re: Hearing Case #12-105H* (included in Volume 4 of Record, which is not paginated, at 343-44.

the child as a student with a specific learning disability. Complaint Investigation Report, *N & S v. Cape Elizabeth Sch. Dep't,* March 28, 2006, (ECF No. 22-2) at 3.

20. The student was receiving instruction from a special education teacher for 3 hours and 45 minutes a week when her PET team conducted the reevaluation that was required every three years under IDEA. *Id*. at 4-5. A tutor saw the student twice a week at home for an hour at a time, a nanny worked with her, and the student spent 2-3 hours every evening to do homework. *Id*. at 5. The director of special education proposed that the student begin sixth grade in a monitor status, meaning that she would not go to the resource room for services, but that the team would reconvene to reassess her placement if she began to fall below the average of her peers. *Id*. at 6.

21. The team implied that it had determined that the student was ineligible for special education because the "Learning Disabilities Evaluation Report" was filled out. *Id*. The notice to the student's parents that was sent after the PET team meeting did not list consultation services as an option, provided no details about monitor status, and stated the reasons for moving the student to monitor status as "her reading comprehension and writing skills are at grade level." *Id*. at 7. It also stated "No other factors were considered to be relevant at this time." *Id*. The investigator took this statement to mean that the team did not consider the parents' provision of a tutor at home, the amount of time the student spent on homework, and the amount and type of daily assistance provided to the student by the parents and the nanny. *Id*.

22. Similar PET meetings and notices ensued. *Id*. at 8-10. The parents continued to provide a tutor and, along with her nanny, assisted the student with her homework and short daily drills. *Id*. at 9. The parents obtained an evaluation of the student's processing abilities and academic development at the end of the sixth grade year. *Id*. at 10. After reviewing this evaluation

14

report and the student's progress at school, the PET team dismissed the student from special education. *Id*. at 12.

23. The investigator found violations of certain MUSER regulations because the PET team did not consider the results of in-house evaluations of the student; "[i]t is not appropriate to expect or require the parents to withdraw their support and wait for the student's educational performance to decline in order to demonstrate 'adverse educational impact' of the student's disability on her education or to demonstrate the value and necessity of specific, appropriate educational support[,]" *id.* at 14; the team "did not give adequate weight to the factors of support provided outside school at home through the parents' efforts and expense and the student's exceptional personal efforts, and thereby did not meet the requirement of 'consideration[,'"] as "[d]iscussing information is not the same as 'considering' information when significant information is discounted and disregarded[,]" *id.* at17; the team failed to include consultation as "other options considered" in its notices, *id.* at 19; and the team failed to retain records of the monitoring services, *id.* at 20.

24. In the instant case, the PET team considered the results of in-house evaluations of GB; there is no issue of "adverse educational impact"; there is no issue concerning consultation as an option; and there is no issue concerning retention of records. With respect to the only remaining reason given by the investigator in the *N & S* case, First Circuit authority is inconsistent with the investigator's interpretation of the concept of "consideration." In *G.D. v. Westmoreland Sch. Dist.*, 930 F.2d 942, 947 (1st Cir. 1991), the First Circuit said, speaking of an independent education evaluation, that federal IDEA standards, which are at issue here, required "only that [it] 'must be considered' in the decision made by a public agency, not that there be substantive discussion of [it]." An entry in the record stating that the document was reviewed by the agency's decision-makers was sufficient. *Id*. That is essentially what we have in the instant case with respect to Ms.

15

Papageorge's findings, as well as those of the student's work at the Center for Communication, and the findings of the experts who conducted the student's 2011 reevaluation. Hearing Opinion at 3 (636), 6 (639), 10-14 (643-47); Record at 60, 134.

25. The plaintiffs make much of GB's November 2011 score on the TOWL-4 test administered by Ms. Papageorge, which placed her in the 7th percentile, asserting that the PET team's failure to mention this test in the written notice of the January 2012 team meeting or on the Learning Disability Evaluation Report form means that they wrongly "ignore[d]" this result, on a test of written expression.³ Plaintiffs' Memorandum at 25. They then fault the PET team for "rel[ying] on a single measure of [GB's] alleged competence in written expression, derived from the WIAT-III[.]" *Id*.

26. A single measure of ability cannot serve as the sole basis for a finding of inadequate achievement in the area of written expression, or of any of the other seven areas in which a student may be found to have a specific learning disability under the IDEA. 34 C.F.R. § 300.304(b)(2); *Ms. H. v. Montgomery Cty. Bd. of Educ.*, Civil Action No. 2:10cv247-WHA-SRW, 2011 WL 666033, at *9-*10 (M.D. Ala. Feb. 14, 2011). Accordingly, neither the TOWL-4 nor the WIAT-III may be dispositive on the question of GB's achievement in the area of written expression.

27. Moreover, the hearing officer's finding that GB's achievement in written expression did not establish a specific learning disability was based on more than one test result or performance factor. Indeed, the hearing officer specifically set out the regulatory standard cited above in her decision. Hearing Opinion at 23 (Record at 656). She then discussed the arguments of both sides and discussed cited case law, after which she wrote:

---

³ A specific learning disability may be established when the student does not achieve adequately for the student's age or to meet State-approved grade-level standards in one of eight areas, including written expression. 34 C.F.R. § 300.309(a)(1)(iii).

> The Team here readily identified the student's areas of weakness, as evidenced by her low subtest scores on several measures, and agreed that the student exhibited a processing disorder. The next question, however, was whether the student was nevertheless achieving adequately in the areas of concern. The student's record as a whole here – including much of the testing performed by Ms. Papageorge, Dr. Hoch, and Ms. Goodwin, as well as her graded IEP goals and report cards, and teacher testimony – indicated that she was indeed achieving adequately in the areas of concern. Here, as in *Hartford* [*Cty. Pub. Schs.* 109 LRP 34467 (Md. SEA Feb. 13, 2009)], the student's low subtest scores suggested the existence of a language-based processing difficulty, but the weight of the evidence regarding the student's performance did not establish that she was not achieving adequately. As such, the student's achievements in written expression, basic reading, and reading comprehension were adequate as evidenced by her record as a whole and the school district did not err in so concluding.

Hearing Opinion at 33 (Record at 666) (footnote omitted). The plaintiffs have not shown that the hearing officer's opinion was contrary to law or without factual support in this regard.

### B. Remedy

28. The plaintiffs contend that the termination of GB's eligibility for services under the IDEA denied her a free appropriate public education. Plaintiff's Memorandum at 30-34. In turn, they assert, the denial entitles them to restoration of GB's eligibility and special education services, funding for two hours per week of tutoring by Hyperion Learning Services, funding to continue those services through the summer for the next three years, and reimbursement for all of their expenditures for services provided to GB by Hyperion and the Center for Communication in the past. *Id.*

Because I conclude that the plaintiffs have not carried their burden on this appeal, I need not reach their demanded remedy.

### III. Conclusion

For the foregoing reasons, I recommend that the foregoing proposed findings of fact and conclusions of law be adopted and the plaintiffs' appeal **DENIED**.

## *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

Dated this 31st day of May, 2014.

                                        <u>/s/ John H. Rich III</u>
                                        John H. Rich III
                                        United States Magistrate Judge